COMMONWEALTH vs. OVIDIO BLANCO REYES.

No. 94-P-707.

Hampden. November 9, 1994. - May 5, 1995.

Present: DREBEN, PORADA, & GREENBERG, JJ.

Further appellate review granted, 420 Mass. 1107 (1995).

*Constitutional Law*, Search and seizure, Probable cause. *Search and Seizure*, Probable cause, Affidavit. *Probable Cause. Controlled Substances. Practice, Criminal*, Admissions and confessions. *Evidence*, Admissions and confessions.

Information in an affidavit in support of an application for a search warrant was insufficient to establish probable cause for the search where neither the basis of knowledge of unnamed informants nor their veracity was demonstrated; the defendant's motion to suppress evidence seized in the search should have been allowed. [485-487]

The confession of a defendant obtained after his arrest following an illegal search of his apartment should have been suppressed as the "fruit of the poisonous tree." [487-488]

INDICTMENT found and returned in the Superior Court Department on December 6, 1991.

A pretrial motion to suppress evidence was heard by *John F. Moriarty*, J., and the case was subsequently heard by him.

*Robert J. Danie* for the defendant.

*Michael J. Hickson*, Assistant District Attorney, for the Commonwealth.

GREENBERG, J. As a result of a search of an apartment, the police seized 125 grams of cocaine, and the defendant was convicted at a jury-waived trial of trafficking under G. L. c. 94C, § 32E(*b*). The primary ground of appeal is that the search warrant issued upon an affidavit which failed to articulate probable cause. There is a secondary point involving the suppression of a confession.

Captain Paquette of the Holyoke police, on November 24, 1991, received a telephone call from a first-time unidentified

informer. This person was later described by Sergeant Harold M. Valentine, in an affidavit submitted in support of a search warrant, as a "cooperating member of the community."[1] The caller related that a large quantity of cocaine could be found inside a second-floor apartment located at 5 Grant Street, Holyoke. According to the informant, two days before the call, on November 22, two Colombians arrived at the locus in a white Blazer motor vehicle with a New York registration plate. The car was parked at the rear of the apartment building. The informant stated that he had seen the cocaine, approximately two to three kilograms, in the second-floor apartment. He had also learned that someone would be leaving that day (November 24) for New York in the white Blazer with a large sum of cash derived from the sale of cocaine.

On the strength of this information, the police sent an officer to 5 Grant Street who confirmed that a vehicle matching the informant's description, registered to Jose Rodriquez of the Bronx, New York, was parked at the rear of the apartment building. A record check indicated that Rodriquez had a criminal record in New York but that his record did not include drug offenses.

From an unnamed member of the "Dominican-Hispanic community," the police learned that the same motor vehicle was used to transport large quantities of cocaine to Holyoke for sale. Valentine also had "personal knowledge" derived from "information received in the past" that the operator of that vehicle (presumably Jose Rodriquez) had been involved in a large-scale crack cocaine operation at another location in Holyoke. That "information received in the past" was not attributed to any particular source.

From municipal records, Valentine learned that the "renter" of the suspect apartment was the defendant, who was a resident alien from the Dominican Republic. Again, from unnamed sources, Valentine stated that he had "received information in the past" that the defendant was a

---

[1]The affidavit is reproduced in its entirety in an appendix to this opinion.

large distributor of cocaine. This conclusion was supported by Valentine's observation of the defendant on an unspecified date in the past year in another part of Holyoke receiving money from a drug sale.[2] Veiled references, apparently developed from "a participant" in that transaction, confirmed Valentine's conclusion that the defendant was a large-scale drug dealer.

Valentine also related in his affidavit that more than three months earlier, a different Holyoke officer arrested another Dominican male (Diego Mejia) for possession of a large quantity of crack cocaine. The other officer "developed information" that this individual was involved in the distribution of cocaine with Jose Rodriquez, the owner of the white Blazer. Subsequent to Mejia's arrest, Valentine saw the defendant Reyes attempt to retrieve Mejia's automobile from the police.

In sum, the search warrant issued was based upon information received from unnamed sources; Valentine's personal knowledge of the defendant including a prior drug arrest; confirmation that the white Blazer was parked near the defendant's apartment; and the defendant's attempt to retrieve another alleged drug dealer's car from the police.

1. *Sufficiency of the affidavit.* Where, as here, the determination of probable cause is based on statements made to the police by a confidential informant, the affidavit must contain "adequate evidence of the informant's veracity and of the basis of the informant's knowledge." *Commonwealth* v. *Richardson,* 37 Mass. App. Ct. 482, 485 (1994). See *Commonwealth* v. *Upton,* 394 Mass. 363, 374-377 (1985). First-hand knowledge of information obtained through personal observation, as demonstrated by the initial informant in this case, satisfies the basis of knowledge prong of the two-part test. See *Commonwealth* v. *Desper,* 419 Mass. 163, 166 (1994). The problem here is with the veracity prong as it is evident that the information in the affidavit comes from a first-time

___

[2]Although the affidavit is somewhat unclear on this point, it may be safely assumed that the defendant was arrested as a result of this transaction.

informant with no track record in the past. See *Common-*
*wealth* v. *Rojas*, 403 Mass. 483, 486 (1988); *Commonwealth*
v. *Parapar*, 404 Mass. 319, 322 (1989). While conceding
that the affidavit does not establish the general veracity of
this initial informant, the government argues that the specific
reliability of the informant's tip is sufficiently enhanced by
other factors to cure the veracity defect. See *Commonwealth*
v. *Parapar*, *supra* at 322.

Even though the initial informant did supply some detail
in his description of the criminal activity alleged, that tip is
not enough, by itself, to satisfy the veracity prong. See *Com-*
*monwealth* v. *Rojas*, *supra* at 487 (recognizing that specific-
ity of detail can contribute to reliability but noting that other
indicia of reliability are usually present).

Independent police corroboration of a detailed tip from a
confidential informant may compensate for deficiencies in the
veracity prong. *Commonwealth* v. *Brown*, 31 Mass. App. Ct.
574, 576 (1991). In the instant case, however, the corrobora-
tion did not go beyond reciting such readily available infor-
mation as the description of an automobile (the Blazer)
parked near the apartment, and ascertaining that it was reg-
istered to Jose Rodriquez, a New York resident with a crimi-
nal record (which did not include any drug offenses). Com-
pare *Commonwealth* v. *Desper*, 419 Mass. at 167-168. Nor
did the police undertake any investigation or surveillance,
make a controlled purchase, or engage in any related activity
that might have cured the deficiency. See *Commonwealth* v.
*Kaufman*, 381 Mass. 301, 303-304 (1980). Contrast *Com-*
*monwealth* v. *Parapar*, *supra* at 323.

We disagree with the government's analysis that the de-
tails furnished by the initial informant were corroborated by
information given by the other informers. These other infor-
mants were also untested. In addition, there is nothing in the
affidavit as to when or how the other informants received
their information. See *Commonwealth* v. *Desper*, 419 Mass.
at 167. They satisfy neither the veracity nor the basis of
knowledge prong of the test, and the general sort of informa-
tion provided did not rise "above the level of a casual rumor

or a mere reflection of the reputation of the supposed actor."
*Commonwealth* v. *Kaufman, supra* at 303.

The first-hand information of the affiant is similarly un-
availing. Even if an inference of wrongdoing was warranted
because the defendant came to the police station to obtain
Mejia's vehicle after the latter's arrest on cocaine distribu-
tion charges, the information was stale. See *Commonwealth*
v. *Zayas*, 6 Mass. App. Ct. 931 (1978). That event preceded
the making of the affidavit by three months. The defendant's
prior arrest on (presumably) a cocaine distribution charge
within the past year is somewhat corroborative in that it
shows "conduct from which the inference may be drawn that
the defendant was not averse" to commit a crime similar to
the one for which he is under investigation. *Commonwealth*
v. *Melendez*, 407 Mass. 53, 58-59 (1990), quoting from
*Commonwealth* v. *Germain*, 396 Mass. 413, 418 n.7 (1985).
We are given few details, however, concerning the circum-
stances of the arrest, whether any contraband was seized at
the time of the arrest, the precise nature of the charges, or
the outcome of the arrest. See *Commonwealth* v. *Desper*, 419
Mass. at 167. Although the defendant's prior drug arrest is
entitled to some weight in a probable cause determination, in
these circumstances it is insufficient to salvage an otherwise
inadequate affidavit.

Accordingly, the defendant's motion to suppress the pro-
ceeds of the search should have been allowed.

2. *Suppression of the confession.* It is unnecessary to con-
sider in detail whether the defendant's confession (obtained
at the police station after his arrest) should be suppressed.
"The 'fruit of the poisonous tree' doctrine, which forbids put-
ting illegally seized evidence to any use, applies to verbal
statements as well as to tangible evidence." *Commonwealth*
v. *Conway*, 2 Mass. App. Ct. 547, 553 (1974), citing *Wong
Sun* v. *United States*, 371 U.S. 471, 485 (1963). Given the
temporal circumstances of the arrest and confession, and the
lack of an intervening event which could separate the occur-
rences, it is plain that the defendant's statements resulted
from the illegal search of the apartment and his subsequent

arrest. *Commonwealth* v. *O'Connor*, 21 Mass. App. Ct. 404, 406 (1986). The statement must be suppressed.

*Judgment reversed.*

*Verdict set aside.*

APPENDIX.

"On 11-24-91 Captain Paquette of the Uniform Division received a phone call from a Cooperating Member of the Community who told him that there was a large quan[t]ity of Cocaine at 5 Grant in a second floor apartment. The CI further told Captain Paquette that two Col[o]mbians operating a white blazer, New York Registration E6J964, had arrived in Holyoke on 11-22-91 and that this motor vehicle is parked in the rear of 5 Grant Street. The CI also told Captain Paquette that they had brought approximately two to three Kilo-Grams which the CI had seen in the 5 Grant Street, second floor apartment. The CI stated that the white blazer would be leaving on 11-24-91 with $300,000 to $400,00 which was made from the sale of Cocaine.

"On 11-24-91 Officer J. Whalen went to 5 Grant Street where he found a white blazer, New York Reg. E6J964, parked in the rear. A check with the New York Registry of Motor Vehicles indicates that his vehicle is register[]ed to Jose A. Rodriquez, Dob 10-23-64, 2053 McGrawn Ave. 1F, Bronx New York. A fu[r]ther check with NCIC indicates that Jose A. Rodriquez has a Criminal record in the State of New York for Carrying a loaded weapon, impersonating a Police Officer, and assault to cause physical harm.

"Myself and Sgt. Dinapoli have personal knowledge of the above listed motor vehicle having received information in the past concerning the operator of that motor vehicle being involved at 289 Walnut Street in a large scale Crack Cocaine and Cocaine operation. We also had information from a member of the Dominican-Hispanic community that this motor vehicle made numerous trips to New York to pick up large quan[t]ities of Cocaine to be delivered in Holyoke area for sale.

"A check with Official City of Holyoke records the renter of 5 Grant Street, second floor is Ovidio Blanco Reyes. I have personal knowledge that Ovidio Blanco Reyes is from the Dominican Republic and is a resident alien. I also have received information in the past that Ovidio Blanco Reyes is a large distributor of Cocaine and Crack Cocaine. I have conducted an investigation into the distribution of Cocaine in the 650 South East Area this year and observed drug sales being made and the money passed to Ovidio Blanco Reyes and Daniel Garcia in a late model Caprice Classic which was register[]ed to Ovidio Blanco Reyes. At the time of this

arrest Mr. Reyes stated that he lived at 289 Walnut Street. Subsequent to this arrest information was developed from a participant that Mr. Reyes was a large scale Cocaine distributor, and that he used several different apartments in the City to move the Cocaine around to a safe house location.

"On 8-16-91 Sgt. Dinapoli arrested a Dominican male, Diego Mejia of no known address, with 80 vials of Crack Cocaine in his possession. Sgt. Dinapoli developed information that Mr. Mejia was involved in the distribution of the Crack Cocaine with Jose Rodriquez who he knew operated the White Blazer, New York Registration E6J964. Subsequent to this arrest I was in the Holyoke Police Department when Mr. Reyes came in to try and secure the release of the motor vehicle Mr. Mejia was operating at the time of his arrest for the Crack Cocaine.

"Based on information received from the Cooperating Member of the Community, my personal knowledge of Ovidio Blanco Reyes, information received by Sgt. Dinapoli concerning the White Blazer and the arrest of Mr. Mejia, information that Mr. Reyes does live at 5 Grant Street, second floor, arrest of Ovidio Blanco Reyes I believe that there is a large quan[t]ity of Cocaine being kept for distribution at 5 Grant Street, second floor."